THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. LOUIS CAPUZI, Defendant-Appellee.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. PAUL KOROLUK, Defendant-Appellee.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. FRANK PEREZ, Defendant-Appellee.

Second District   Nos. 2—98—1031, 2—98—1034, 2—98—1035 cons.

Opinion filed November 4, 1999.—Rehearing denied December 9, 1999.

GALASSO, J., concurring in part and dissenting in part.

Michael J. Waller, State's Attorney, of Waukegan (Stephen E. Norris and Kevin Sweeney, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Gregory R. Ginex, of Ginex & Fecarotta, P.C., of Westchester, David S. Mejia of Chicago, and Alan I. Lapping, of Alan I. Lapping & Associates, of Northbrook, for appellees.

PRESIDING JUSTICE BOWMAN delivered the opinion of the court:

Defendants, Louis Capuzi, Paul Koroluk, and Frank Perez, were indicted for residential burglary (720 ILCS 5/19—3(a) (West 1996)). They moved to quash search warrants for their residences and to suppress evidence seized pursuant to the search warrants. The trial court granted defendants' motions on the grounds that the descriptions of property to be seized contained in the warrants were too general and that the judge who issued the warrants was not a neutral and detached magistrate. The State filed a certificate of impairment, and this appeal ensued. The State contends that (1) each defendant had standing to challenge only the search of his own residence and lacked standing to contest the search of any other residence; (2) the search warrants' general descriptions of the property to be seized were appropriate under the circumstances; (3) even if the search warrants were too general, the officers who executed the warrants were entitled to rely in good faith on their validity; and (4) there was no evidence that the judge who issued the search warrants was biased against defendants.

The warrants at issue were based on a sworn complaint dated November 19, 1997, and executed by Sergeant Thomas West of the Chicago police department. West stated that he belonged to a multi-jurisdictional task force that was investigating over 100 residential burglaries committed in Chicago and surrounding counties between September 1996 and November 1997. The task force had focused its investigation on Koroluk and Capuzi. Both Koroluk's residence at 2153 West Race Street in Chicago and Capuzi's residence at 702 North Rockwell in Chicago, which was also the residence of Capuzi's stepson Perez, had been under surveillance.

West alleged that on November 14, 1997, Koroluk, Capuzi, and Perez were observed loading a large dark bag into a maroon GMC Jimmy truck at Capuzi's residence. Defendants left in the truck and returned three hours later in a different vehicle. West further alleged that on November 15, 1997, the homes of Kun Ho Kim and Alan and Camy Gould, both of Long Grove, were burglarized. At both the Kim and the Gould homes, the burglars cut telephone wires to circumvent the alarm systems, opened doors with pry bars, disabled the motion sensors, and then went to the attics to further dismantle the alarm systems. Police officers found similar sets of footprints outside both homes. The complaint did not set forth the items that were stolen from the Gould and Kim residences other than to say that a set of golf clubs was taken from the Kim residence.

On the evening of November 15, the Goulds arrived at their home to find a "red Blazer type" vehicle parked in their driveway. The Goulds were able to see the driver of the vehicle, whom they later identified as Koroluk. Approximately 1½ hours after the Gould and Kim burglaries, Koroluk and Capuzi were videotaped at Capuzi's home unloading a set of golf clubs and a black bag from the maroon GMC Jimmy. After leaving 702 North Rockwell, Koroluk and Perez drove to Koroluk's home in the GMC Jimmy and took items into Koroluk's house.

On November 19, 1997, Judge Booras signed warrants authorizing searches of defendants' persons and their residences. The portions of the warrants relevant to the issues before us are identical and provided for the seizure of the following items:

> "Jewelry; United States currency; golf clubs; firearms; proof of residency or occupancy; any and all documents from National Car Rental System, Inc.; and any and all stolen property, shoes, masks, gloves, burglary tools and all instrumentalities used in furtherance of the offense of Burglary."

Defendants moved to quash the search warrants and suppress all evidence seized as a result of the warrants on the grounds that prob-

able cause was lacking, the description of items to be seized was impermissibly general, and the issuing judge, Judge Booras, was not a neutral and detached magistrate. On appeal, the State challenges the trial court's rulings on the latter two grounds.

On June 11, 1998, a hearing was held on the motions to quash and suppress evidence. Perez and Koroluk testified about remarks Judge Booras made about Koroluk. Koroluk testified that in 1985 he was tried in Lake County for a criminal offense. Judge Booras, who at that time was an assistant State's Attorney, prosecuted Koroluk. Koroluk was convicted, but his conviction was reversed on appeal.

Koroluk testified that the first time he appeared before Judge Booras in the matter at issue, Judge Booras said, "I've been waiting for you, Paul. You remember me, don't you?" The second time he appeared before Judge Booras, Judge Booras said, "I call old friends by their first names, right Paul?" Judge Booras also stated that he and Koroluk "went back a while" and that he was the prosecutor on a case against Koroluk about 10 years ago. Perez testified that he heard Judge Booras say that he remembered Koroluk and was waiting for him.

The trial court also heard testimony from Sergeant West pertaining to the search warrants. West testified that he prepared the warrants with help from a Lake County assistant State's Attorney. In West's view, the warrants were not limited to recovering property stolen from the Gould and Kim residences. They also included property stolen in the approximately 100 other burglaries between September 1996 and November 1997 in which defendants were suspects.

West testified that, at the time he prepared the complaint for the search warrants, he did not have a list of the property taken from the Gould and Kim residences in his possession. West admitted that other officers, however, did have detailed descriptions of the stolen property. West further testified that on the night of November 15 the members of the jurisdictional task force communicated to each other what had been found at the Gould and Kim residences. He stated, "We had numerous devices of communication between us and between the various jurisdictions." West also testified that prior to seeking the search warrants he had spoken with Officer Pranke of the Lake County sheriff's department, the investigating officer for the Gould and Kim burglaries, who had given him information that he included in the complaint for the search warrants. Pranke had talked with the Goulds and the Kims about the burglaries.

West also testified that there were several suburban investigators who had "much more detailed knowledge than [he] did of specific

types of shoes to be seized." West stated that he was aware that the officers had this specific information before he signed the complaint. When asked about "burglary tools," West said, "[I]n this particular investigation, there were pry bars and sledge hammers used at various locations so that could be—in the investigation that could be described as a burglary tool."

On July 30, 1998, the trial court issued a written order granting defendants' motion to quash the search warrants and suppress the evidence seized pursuant to those warrants. The State then timely filed a certificate of impairment, and this appeal followed.

■ The State argues first that Koroluk lacked standing to contest the search of Capuzi and Perez's residence, and Capuzi and Perez had no standing to contest the search of Koroluk's residence. Defendants argue that the State waived this argument by failing to raise it in the trial court. We agree with defendants. The case of *People v. Holloway*, 86 Ill. 2d 78 (1981), is controlling on this issue.

Like the matter before us, *Holloway* involved an appeal by the State after the trial court granted the defendants' motion to suppress. One of the defendants orally joined in the other defendant's motion to suppress, and the State failed to raise the issue of standing until the appeal. *Holloway*, 86 Ill. 2d at 91. In holding that the State waived its right to challenge the defendant's standing, the court noted that the principle of waiver applies to the State as well as the defendant and that by failing to raise its objection in the trial court the State deprived the defendant of the opportunity to establish that he did in fact have a sufficient interest in the premises to create standing. *Holloway*, 86 Ill. 2d at 91.

The same considerations apply here. The State never objected to defendants' standing in the trial court, so defendants did not have an opportunity to present any evidence in rebuttal. The State's argument that the standing issue was raised by virtue of defendants' burden to establish standing is without merit. While defendants may have the burden of establishing standing, the burden of objecting to standing is the State's. Accordingly, we find that the State has waived this issue.

Next, the State asserts that the descriptions of the property contained in the search warrants were proper under the circumstances and that the trial court erred in ruling that they were impermissibly general. Before reaching the merits of the State's argument, it is necessary to address the standard of review. The State contends that no facts pertaining to the search warrants are in dispute and urges us to apply a *de novo* standard of review to the trial court's ruling. Defendants argue that we should not overturn the trial court's ruling unless it is manifestly erroneous.

■ The case of *People v. Mabry*, 304 Ill. App. 3d 61 (1999), is instructive with respect to the appropriate standard of review. In *Mabry*, this court held, pursuant to the supreme court's ruling in *People v. Gonzalez*, 184 Ill. 2d 402 (1998), that a reviewing court must conduct a two-part analysis of a trial court's decision to suppress evidence. *Mabry*, 304 Ill. App. 3d at 64. The first step is to determine whether the trial court relied on any factual findings in making its decision, and, if so, whether those findings were clearly erroneous or against the manifest weight of the evidence. *Mabry*, 304 Ill. App. 3d at 64. If they were not clearly erroneous or against the manifest weight of the evidence, they will not be disturbed on appeal. *Mabry*, 304 Ill. App. 3d at 64. Next, the reviewing court must apply *de novo* review to the legal question of whether the evidence should be suppressed. *Mabry*, 304 Ill. App. 3d at 64. Here, the trial court did rely on certain factual findings in suppressing the fruits of the search warrants. After a review of the record, we conclude that those findings were not clearly erroneous or against the manifest weight of the evidence for the following reasons.

■ The trial court found that Sergeant West had time to obtain more specific descriptions of the property stolen from the Gould and Kim residences. The trial court also found that West had access to the officers who interviewed the Goulds and Kim and therefore could have obtained more specific information about the items stolen from them. In this regard, the court stated:

> "He had over three days to obtain specific lists of items which certainly at a minimum could have been broken down by size, color, stones and content, as to the jewelry. He had access to the information necessary to provide denominations as to 'United States Currency' if any was in fact stolen in the burglaries, to provide brand name, club size and type, bag size and color, to provide the size of the 'shoes' being sought, the type of 'masks,' the type of 'gloves,' and what was meant by 'burglary tools.'"

These findings were not clearly erroneous.

The State did not present any evidence suggesting that no description of the property stolen from the Goulds and Kim existed at the time West was preparing the warrant. Although West testified that he did not have specific information about the items stolen from the Goulds and Kims in his possession at the time he was preparing the complaint, there is ample evidence that demonstrates that West could have obtained specific information from other officers involved in the investigation. West admitted that other officers involved in the investigation had detailed descriptions of the property taken from the Gould and Kim residences. West also testified that other officers had

specific information about the shoeprints and the shoes to be seized. West's testimony also indicated that he was aware of certain burglary tools, including pry bars and sledge hammers, that had been used in the burglaries. West's testimony supports the trial court's finding that it was possible to describe the items to be seized with more particularity. It appears from the record that West had a significant amount of information at his disposal but chose not to include it in the warrants. Accordingly, we find that the trial court's findings of fact were not erroneous or against the manifest weight of the evidence.

■ Next, we turn to the legal question of whether the court should have suppressed evidence in the cause before us. The United States and Illinois Constitutions (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6), as well as section 108—7 of the Code of Criminal Procedure of 1963 (725 ILCS 5/108—7 (West 1996)), require that a search warrant describe with particularity the person or place to be searched as well as the property to be seized. It is not necessary to give a "minute and detailed" description of the property to be seized, but " 'the property must be so definitely described that the officer making the search will not seize the wrong property.' " *People v. Batac*, 259 Ill. App. 3d 415, 420 (1994), quoting *People v. Prall*, 314 Ill. 518, 523 (1924). Put another way, the warrant should provide the executing officer with sufficient information "by which he could select certain property within the description in the warrant and refuse to take other property equally well described in the warrant." *Prall*, 314 Ill. at 523.

■ Courts must determine whether warrants are sufficiently specific on a case-by-case basis. *People v. Allbritton*, 150 Ill. App. 3d 545, 547 (1986). In so doing, a court should consider what degree of descriptive detail is reasonable given the nature of the items involved and the progress of the police investigation at the time the warrant was issued. *People v. Rende*, 253 Ill. App. 3d 881, 886 (1993). Courts have held that generic descriptions are sufficient in some instances, such as when more specific descriptions are not available or when detailed descriptions are intrinsically difficult and there is a probability that the items sought will constitute a large portion of the inventory to be searched. *Rende*, 253 Ill. App. 3d at 886. However, a general description of the items to be seized is not appropriate if a specific description is available to the investigating authorities. *Batac*, 259 Ill. App. 3d at 420.

As we have noted, the court found that specific descriptions of the stolen jewelry, golf clubs, currency, firearms, shoes, masks, gloves, and burglary tools to be seized were available to West had he chosen to seek out that information. The court also determined that more specific descriptions were necessary, citing *Allbritton* and cases cited

therein for the proposition that "jewelry" and "currency" are not sufficiently descriptive terms on their own.

In *Allbritton*, the State procured a warrant to search the defendant's home for " 'jewelry, chains, cuff-links, sweater-closers and diamonds.' " *Allbritton*, 150 Ill. App. 3d at 545. The court held that this list of items provided the executing officers little guidance as to the physical appearance of the items to be seized and provided no basis for the officers to determine whether pieces of jewelry found at the defendant's home were covered by the scope of the warrant. *Allbritton*, 150 Ill. App. 3d at 547-48.

Likewise, in *People v. Holmes*, 20 Ill. App. 3d 167, 172 (1974), the court found the description an " 'undetermined amount of United States Currency' " to be "meaningless" because it failed to distinguish between funds obtained in the robbery defendant was accused of committing and funds from any other source. Similarly, the court found the term "weapon" provided the executing officers unlimited discretion as to what they could seize. *Holmes*, 20 Ill. App. 3d at 172.

■ Like the trial court, we find that more description was necessary to avoid violating the fourth amendment. In drafting the warrants, the State made little effort to limit in any meaningful way the items to be seized. As the trial court recognized, many, if not most, homes will contain jewelry, currency, shoes, and gloves. Many homes also contain golf clubs and firearms. The warrants also authorized the executing officers to seize "any and all stolen property" without providing any information upon which the executing officers could distinguish between stolen property and property that belonged to defendants. In short, with the exception of the rental car documents from National Rental Car, the warrants left the items to be seized largely within the discretion of the executing officers. West admitted as much in his testimony. Given that West had the resources of the task force at his disposal, including all of the information that the other members of the task force had collected over the course of their investigation, the search warrants' lack of detail was not reasonable under the circumstances.

The State's argument that further description was impracticable because defendants were suspects in a large number of burglaries is unavailing for several reasons. In some cases, it may be impractical to require substantial description when a large number of crimes are involved, but this is not one of those cases. A task force had been in place for some time investigating the burglaries. Throughout the investigation, officers prepared reports of the burglaries that took place. West testified that he had read the burglary reports, although not immediately before executing the complaint. Furthermore, requir-

ing the warrants to describe more particularly the items to be seized does not mean that the State must list and describe every single stolen item. The amount of description that is reasonable and necessary will depend on the facts of the case. Here, though, the State made a minimal effort to describe the items to be seized, despite having more specific information in its possession. We conclude, therefore, that the trial court did not err in quashing the search warrants and suppressing the items seized.

Parenthetically, we note that, in addition to the overly general descriptions of items to be seized that we have addressed, the warrants also sought "all documents from National Car Rental System, Inc." The trial court's ruling with respect to this portion of the warrants is ambiguous. The trial court noted in its order that "[o]utside of the description of 'all documents from National Car Rental System, Inc.' there was no specificity." The court went on, however, to order "that the items seized during the execution of the search warrants issued in this case are suppressed from evidence in these proceedings." A court may sever the valid portion of a warrant from the invalid portion. *Rende*, 253 Ill. App. 3d at 885. However, because the parties did not raise this issue, we have not addressed it and leave it to the trial court to determine whether the car rental documents should be admissible at trial.

We next consider the State's argument that, even if the search warrants were improper, the evidence obtained as a result of the warrants is admissible under the good-faith exception to the exclusionary rule. Defendants argue that the State waived this argument by failing to raise the good-faith exception in the trial court. The State contends that the issue is not waived because the good faith of Sergeant West was explored in the record. The record indicates that defendants argued that probable cause was lacking because West made certain statements in the complaint in bad faith, and West was questioned in that regard. It is undisputed, however, that the State did not raise the good-faith exception in the proceedings below, thus depriving the court of the opportunity to determine whether the exception applied. In *People v. Damian*, 299 Ill. App. 3d 489, 494 (1998), the court held that the failure to argue the good-faith exception at the trial court level resulted in the waiver of that issue on appeal. We agree and consequently find that the State waived the issue of whether the good-faith exception applies in this matter.

The State's final argument is that the trial court erred in ruling that Judge Booras, who issued the search warrants, was not a neutral and detached magistrate. We need not address this issue, as we have already determined that the trial court did not err in finding the search warrants defective because they were too general.

For the reasons stated, we affirm the order of the circuit court of Lake County granting defendants' motions to quash the search warrants and suppress the evidence seized pursuant to the warrants.

Affirmed.

GEIGER, J., concurs.

JUSTICE GALASSO, specially concurring in part and dissenting in part:

The majority has prepared a well-reasoned decision on all issues raised by the State with the exception, in my humble opinion, of whether all the property descriptions contained in the search warrants were impermissibly general.

On the issue, I concur with the majority in setting forth the appropriate standard of review. Applying that standard to the items set forth in the search warrants, I cannot conclude that the term "golf clubs" is impermissibly general. If this warrant required the seizing of a baseball bat, must it state Louisville Slugger and size? If this warrant required the seizing of a tennis racquet, must it give the brand name and size? I think not.

In this case, the warrants were issued based upon a sworn complaint dated November 19, 1997, four days after the burglary of the Kim residence, from which a set of golf clubs was taken. "Jewelry" may be impermissibly broad, as would be "currency," "burglary," and "sporting equipment," but I believe "golf clubs" is sufficiently descriptive and that the trial court abused its discretion in not permitting the warrants to stand as to the term "golf clubs."

My dissent is limited to the term "golf clubs" as contained in the search warrants.